Good morning, Your Honors. My name is Lisa Kanter, and I'm here this morning on behalf of Timothy Dupree and his daughter Alexandra Martini, the appellants in this matter. I understand I have 15 minutes for argument. I'd like to reserve 3 minutes for rebuttal. We've heard some very interesting cases this morning and some excellent argument, and I'm hoping to rise to the occasion. But I'm here this morning on behalf of a teenage girl who suffers from type 1 diabetes, is insulin dependent, and also had an alcohol and substance abuse problem. Alexandra Martini's parents simply wanted residential drug treatment, which is covered by her plan, at a facility which could also handle her medical problems, and Holman, her insurer, refused. Now let me say a few words about what this case is not about. This is not about Holman paying for her medical treatment. She had health insurance through Blue Cross, and Blue Cross paid for the medical portion of her treatment. This case is not about whether this was an emergency. Arguments about emergencies were made below, and I think the better view of this is that this was not emergency treatment, as defined by the plan. And this case is not about whether Holman authorized Alexandra to be treated at Visions. There were factual disputes about that that the district court resolved against my clients, and I am not challenging those. This case is about what the plan says and how a plan cannot impose a requirement that is not found in the plan. So when Holman refused to authorize treatment, the basis for that refusal was that the child could only be treated at a contracted provider. And this requirement, that she could only be treated at a contracted residential treatment center, is not in the plan. Now, a risk of jurisprudence may be fuzzy on that. We're talking about a plan that bore which date? I'm talking about the plan that was dated in 2004 before she got treated in 2005. So the plan that I'm talking about consists of three different documents found at 369 to 395 of the record. That's called the group contract. The benefit schedule, which is found at 396 to 402, and the evidence of coverage, which is at 403 to 422. There are lots of versions of the plans produced by the other side. Well, let's see. Okay. We have an excerpt of record 399. Up at the top of the page, it says residential treatment, transitional care, date treatment, partial hospitalization. Then at the bottom, there's a date, February 04. Correct. Now, then we have another sheet at ER 426. Right. That was effective 12-9-0-4. Correct. That's the one that applies? Well, actually, the parties all assumed that. And the treatment was on 9-7-0-5. Correct. The parties all used the February 04. For my purposes of my argument today, there's no difference between the two, so I can talk about either one. So there is a difference. There is a difference. There's a difference in the residential treatment section, whether it says that this is a combined treatment under the residential treatment section. But there is still only one residential treatment section, and that is my point. Because if you look at both plans, there are three categories of treatment. There's hospitalization, there's outpatient, and there's residential. For hospitalization, there are two sections. One says contracted providers. One says non-contracted providers.  And that makes sense, because if you have a mental illness emergency, a mental health emergency, you should be able to go to your local hospital, whether Holman's has a contract with your hospital or not. For outpatient, which is your, you know, seeing a therapist, when you look at the drug treatment for outpatient, it specifically says on page 426, which is, this is the 1204 plan, non-contracted providers, outpatient services, not a covered benefit. Clear language, if you want to see a therapist, outpatient, you have to use a contracted therapist. Well, you know, when you get to residential treatment, on page ER 399, it says days, you know, days, years. This is a combined benefit for in and out of network providers. Exactly. Okay, that's what that one says. And so that's, the date on that is February 04, right? Correct. Okay, but her treatment was on September the 7th, 05. Correct. And the. The 426 does not have that language. Yeah, okay. But if you look at the, all the other sections, when it says contracted and non-contracted, it always says this is a combined benefit for in and out of network. Because you can't go to a non-contracted hospital, stay in that hospital for three days, and not have that count towards your days. It has to count together. That's what that means. My point is this, Your Honor. The residential section is the only one that is not divided between contracted and non-contracted. There's only one section, and it doesn't say anything about contracted or non-contracted. That's my point. Okay, we got that. Okay, so if you go back. But why doesn't the, she was treated on 9-7-05. Right. So why doesn't the, the. The December 04. Why doesn't, then, why doesn't the excerpt of record 426 apply? I think it should apply, Your Honor. But the defendants always took the position it was the February 04. And since there was no legal significance that I could see to the difference, we just all went with that. There is a language difference, but it has to do with. Part of your argument was based on that. Part of my argument was based on that for the in and out of network. Right. But my point here today is that when you look at the group contract, at least four different times the group contract says that an enrollee must use a contracted provider except in an emergency or as otherwise provided or authorized in the plan. And that's the critical language. All right. That language has to have some meaning. And the only meaning that has been ascribed to it is the residential section. Because the residential section is otherwise authorized in the plan. And let's remember that contracted providers just mean that Holman has a deal with them over how much they're going to pay them. But what do you think is otherwise provided coverage here? Yeah. I'm sorry? What do you think is otherwise provided coverage here, then? The residential treatment section. For what? For alcohol abuse or for severe. Anything, huh? Well, anything that you get authorization from. Of course, it has to be ñ it has to be medically necessary. If you've entered a place on an emergency basis, you're going to need to stay there. Well, but why would it say on an emergency basis or as otherwise provided? It's that language that has to be given some meaning. Because after the emergency is over, they may decide it's best for you to stay there and not move. Or they may decide it's best for you to go to residential treatment, which is exactly what happened here. And if they are not distinguishing in their benefit schedule between contracted and non-contracted, how can they tell this family you have to use a contracted provider? Did you get authorization to go there? No. Don't you have to get authorization to go there? We asked for authorization. It was denied on the grounds that it was not a contracted provider. And that's the issue. Why didn't you use the grievance procedure, then? They used the grievance procedure when they filed the bill. And believe me, Your Honor, if I had been involved, they would have used the grievance procedure earlier. But they used the grievance procedure when they filed the bill. They were denied again because it was not a contracted provider. They appealed. They were denied because there was no preauthorization. They appealed, and they were denied because it was not a contracted provider. So the legal issue here is can they require this young girl to go to a contracted provider when, in our view, the plan doesn't require that. And all they were asking for, again, is a place where she could be treated for both conditions, for her diabetes and for her drug abuse, not payment. They don't agree with you. That's the plan. I understand they don't agree with you. But my point is that you have to give meaning to all the language in the plan. And they have not offered any other meaning for that language, because emergencies are clearly dealt with in the benefit schedule.  And let's face it. When do you go? An emergency, you go to a hospital. You don't go to residential treatment because you've had a drug overdose. You go first to the hospital, and then you figure out what kind of treatment to have. It makes perfect sense not to have that distinction with residential treatment, because, you know, maybe they didn't negotiate contracts with as many residential treatment centers. But that's the distinction that we are trying to draw. There's a lot of evidence in the record about whether the two facilities that they offered could have treated her diabetes. It's our position you don't get to that issue if they couldn't have required her to go to a contracted residential treatment center. But I think that if you look at the evidence, the evidence on that issue, the declaration that was submitted by Holman even says that she would have to be transported somewhere else to treat her diabetes, and that the only thing that those two facilities could do would be to treat her drug abuse. Let me ask you this. So, I mean, are you saying that the parties have agreed, stipulated that the first version that I read, let's see, the one that's on the February version? No, just hold on. The one that's on ER-399, that's the operative version? My recollection, Your Honor, is that that is the version that's referred to in both briefs by the opposing parties, but I can look for it. It's not that question. Is it the operative? No, it's not. It was not stipulated. I don't think it was stipulated. I think both versions of it. What's the operative provision? The operative evidence of coverage? That provision applies. Which applies? What you used or what you thought or what you didn't think of. Which one applies? The operative benefit schedule that we relied on was 396 to 390, I'm sorry, to 402. That's not my question. Not what you relied on. Which one is the correct one? 396 to 402 is the correct one, because that was what, that was dated February 04, and that was what was attached. That was what was attached to the group contract. The December 04 one was produced at a later date. And we have no evidence that it was, in fact, attached to the group contract and, in fact, attached to the agreement. So that should be whether it's operative at all? Is that your question? No. My question is whether it was given to the plaintiff. The plaintiff had the February 04. In ERISA, you have to get the SPD and you have to get what the benefits are described. Was it held in front of you? No. I just don't know why it wasn't produced. I don't, I have no explanation why they didn't produce it to us. They produced seven or eight versions of these plans. Well, where did it show up? I can't answer that. So what you're saying is that the copy of a plan that Mr. Dupre had at the time that the young woman, Alexandra, went into the division was the plan that had ER-399 attached to it. Correct. And they didn't know anything about the, that other one that's shown on 426, right? That's my understanding, Your Honor. But, again, for purposes of this argument, I don't think it matters because the residential treatment is in one section in both plans. Now, I also believe that there was a later version in December 05 where they changed, they fixed it. Yeah, they fixed everything. Right. Yeah, that was the next point. Okay. So after they put in their, for the first time, contracted residential treatment. Correct. Yeah. So your argument is that whether, that the one at 399, wait a second, the one at 399 was ambiguous, but probably a little less so. And the one at 423. Right. That was also, had ambiguities, but they cleared it up so that nobody could misunderstand it when they came up with a 929.05. This was 22 days, I think, after she went in. Is that it? Something like that, at 452. Right. After she, her treatment began. So it doesn't matter because the first two I talked about, the 424 and the 399, their coverage provisions are ambiguous. At best, Your Honor. Okay. And I've got to construe that in favor of the patient, huh? Yes, Your Honor. All right. So why don't we hear from. Thank you. Yeah. Thank you, Your Honor. My name is Robert Bonner. I'm here on behalf of Holman Professional Counseling Centers. I'm going to take approximately ten minutes, and then my colleague, Mr. Vanik, who's here on behalf of the Beverly Hills plan, will take about five minutes. Your Honor, this is a closed, Your Honors, this is a closed plan. What that means is Holman contracts with a number of out-of-state or rather out-of. Well, I mean, we have to look at the plan, don't we? Yes, in looking at the plan. Can we determine which one of these is the operating plan? Well, I think that these plans, these various plans, as I understand it, were these evidence of coverage that were issued at different times during the year. I think at the time this person went into Visions, the out-of-network provider, I think that was approximately September 7th. So I think September 7th of 2005. So I think it would be probably the plan that was in place would be the 12904 plan at that time. That's right. And that's what's agreed to in the record, but you're all talking about one in February. Well, I think that everybody talked about that is because counsel was making that argument about the plan. Well, but that doesn't carry any water. I mean, she could have talked about anything. Well, I understand that. And you could have come in and said, well, wait a minute, you know, you're talking, you're barking up the wrong tree. But you didn't do that. Well, the point is, Your Honor, I think with the benefit of schedules, first of all, it's not a grant of coverage. It just talks about available limits of coverage plus deductibles and co-pays. That's how it's defined in the plan. And what that means basically is it's talking about how many days you can have, how many days coverage you can have. Well, it says is the combined benefit for in and out of network providers. And all the others, the other coverage provisions, all you talk about are contracted providers. Well, I think that's in recognition that with a hospital, you can have two type of situations. You can have. Well, then why did they go ahead and amend it back there 22 days after this young lady was in the hospital? And then to put in contracted residential treatment, so and non-contracted providers. Well. That was done on 929.05 after the treatment. So now it's clear. Well, I don't think it's ambiguous, Your Honor, because I think under certain circumstances, if you look at the plan as a whole, under certain circumstances, people can use emergency services. Well, let me ask you this. What was given to Mr. Dupre at the time Alexandra went to the hospital? Well, Your Honor, I imagine that it's not clear from the record, but I imagine that the different evidence of coverage would probably have been issued to the enrollees. Certainly they would have gotten one when they originally became participants under the policy. I don't know that I can say specifically. Well, he had to apparently head to 399, page 399, which talks about combined benefits. And I don't think you can reconcile that benefit schedule with the rest of the contract to read that it just allows somebody to go in and use a non-contract. Well, if there's any ambiguity, you've got to construe it. But I don't think that there is an ambiguity, Your Honor. It seems to me, counsel, that Judge Hall asked the operative question here, which is really the crux of this case at the very beginning of the argument, and that was to opposing counsel. And that had to do with the issue of even assuming we're using the version of the plan which opposing counsel believes is the correct version. She quoted a bunch of language which had to do with emergency and then on. And why don't you address that? Because that's the crux of this case. That's what they're alleging is ambiguous. The whole question of emergency? No, no, no, no. The issue of using the contracted versus non-contracted providers. You heard her argument. That was her whole argument. Right, right. So why don't you address that directly? Well, the issue of using, you can, the only time you can use a non-contracted provider under the contract is in an emergency situation. You could, under the contract, presumably somebody could have bought coverage to include non-contracted providers, but they didn't do it under this plan. If you look under the plan, for instance, subacute partial day treatment, it says not a contracted benefit. Also, ambulance services is a non-contracted benefit. The plan contemplates using contracted providers in all but an emergency situation. The benefits schedule, I would submit, Your Honors, is simply setting forth what limits of coverage you can have in terms of days, copayments, and benefits, that sort of thing, when you use the plan. If you use the plan, a contracted provider, and in certain cases, a non-contracted provider, if there was an emergency, you have the same level of benefits available to you in terms of days and copayments, that sort of thing. I would submit that's not a grant of coverage. Well, let me ask you this. The first version, the one that was talked about in the briefs, that was effective February 2004. And from what I gather, it was the version that was in effect when the Dupre's purchased the behavioral health plan, Category 3, Section C of the plan, stated that residential treatment is a combined benefit for in and out of network providers. And then this language was removed in the next version. Now, were the beneficiaries, the policyholders, whatever you want to call them, were they advised that that language had been changed? I don't know that we can tell that from the record, Your Honor. My understanding, however, is that the evidence of coverage are issued at different times during the year, so I think we can presume that they did receive copies of the different versions. But I don't know that we can specifically tell that from the record. Well, look, even if you look at version 2, it was apparently effective December Well, if you look at version 2, it was effective December 2004. Though Holman Centers removed the combined benefit language from the plan, an argument can be made that the plan is still ambiguous with respect to residential treatment. The plan distinguishes, for example, between non-contract provider inpatient services and contract provider inpatient services. And then the plan also distinguishes between non-contracted provider outpatient services and non-contract provider outpatient services and contracted outpatient services. And the plan also states that the non-contracted provider outpatient services is not a covered benefit. But the plan does not distinguish between non-contracted provider residential treatment and contracted provider residential treatment. So if you read the others, the first two, well, they distinguish between the two. When you get to the residential treatment, it doesn't. So you've got an ambiguity there. And then after she was treated, then the plan was amended again to specifically refer to contracted residential treatment. So it's clear now. I would submit, Your Honor, that you have to read the contract as a whole and look at all its provisions and not just look at that section. You have to look at the different coverages. Well, if you look at things such as contracted and non-contracted inpatient hospital services, I think it's a clear situation where you can have a situation where that could occur. A non-contracted hospital, an extended stay, non-contracted hospital situation could happen if somebody was in an automobile accident and was on a respirator, for instance. In those circumstances, if you look at the plan, there's a provision in there allowing for concurrent review where the plan can actually look and see, monitor the condition of the person and determine whether or not to send them to a contracted or non-contracted provider. But we're talking about treatment centers. Well, if the treatment center was to be the same, if you look at the plan as a whole, the only type of coverage that's allowed from a non-contracted provider is in an emergency situation. And so wouldn't they, in the residential treatment section, wouldn't they also have a concurrent review provision in there, too? Yes, we'll allow you to have some stay for an emergency purposes and use a non-contracted provider, but we're allowed to monitor that. And if you are stable, we can send you to a contracted provider. What is this language, or is otherwise provided in the plan? That was what I was trying to get you to get to. All right. Well, you can buy in the plan, if you look in the plan, you can buy non-contracted providers outpatient services. However, in this plan, there isn't a provision for that. For instance, I believe. But what does it say, or is otherwise provided in the plan? It doesn't provide anything in the plan. Well, you could. They could put an addendum on the plan to allow you to do that. That's rather general language. It's probably in all the contracts. So that was something that was available to them, but they didn't buy it? Yes. Yes. I think if you look at, for instance, it says non-contracted providers outpatient services on ER 452, it says not a covered benefit. So there's an indication there that on that form, it's basically a form. On that form, if they had paid a different premium, they could have gotten that coverage. It's not, a lot of the plan is rather standard language, but it can be adapted if you buy that additional coverage. They didn't do that here. And if you look at the plan, there's no place else in the plan where you can Well, the opposing counsel takes the position that that means the only other thing that it provides, then, is you have to refer back to and incorporate language in the plan relating to residential treatment. But I think that that's raising that to a level that really wasn't intended. I think the benefits schedule simply talks about the number of days and the copayments and deductibles you can use for certain services. It doesn't serve as a grant of coverage, Your Honor. I think there probably are cases where you can use residential treatment on an emergency basis. You've got to make that clear over there. You've got to make that clear. Well, I think that if you look at the Otherwise provided in the plan, this clause only applies if you get additional coverage. Well, but if you look at the plan as a whole, there's so many provisions in the plan that talk about But you've got to make it clear. You have to make these things clear. But I submit that if you look at all the other provisions of the plan where it if you don't do so, except in an emergency, really makes that clear, Your Honor. And the other point I'd like to make, and I'm going to give it over to my counsel here, my esteemed colleague here, is that there wasn't, even under that theory, there has to be preauthorization. And the district judge found, as a matter of fact, that there wasn't any preauthorization for this coverage. He found that there were two in-network providers provided, and that the enrollee was told that there wouldn't be coverage for treatment with an out-of-network provider. And there's also evidence that later on, you know, after this person was put in the facility, that the case manager was still saying, you know, we haven't heard anything more back from the family about this. And then the district court found, as a matter of fact, that there wasn't any preauthorization, and that a letter that was created months later was not as believable as the case management notes. So there wasn't even preauthorization. And he also found that there wasn't any evidence of medical necessity. He looked at notes from the psychiatrist who said that we could have handled this in-network. He believed that, rather than declarations, you know, months and months later. She had type 1 diabetes, right? That's true. That's a pretty devastating form of diabetes for a young person. It might be, but that's not Well, it is. It is, you know. Okay, I won't. I mean, kids that have that, they lose, you know, they can suffer blindness, loss of organ functions and all that. But we don't cover medical conditions. We cover behavioral health conditions. Yeah, I know. But there was, that's something that had to be taken care of. Well, and she had medical coverage for that. Yeah. But all we cover is behavioral health. It has to be taken care of in one place. Well, then if we could have coordinated, there's a declaration in the record. We're really getting beyond to factual questions. You could have taken her to some other doctor. To have treated the medical aspects of it. But you need somebody there around the clock. When you have a patient who is ill and has that type 1 diabetes, you just can't handle it with just taking someone to another facility. Even once a day, you need somebody with them all the time. Well, I submit, Your Honor, that the district court found that there was no evidence that Holman's contractor provider couldn't deal with this. And he ruled that as a matter of fact. And it's not clearly erroneous. There was evidence in the record that could support that. And I think on appeal, we have to look at that. We have to give deference to the district court's determination of factual issues and the determination of even credibility of witnesses. And I'd like to, if I could, give it over to my co-counsel. You took time away from me. How much have you got left? I'm a little over, but if he could have just a minute, I think he could probably. I'll give him a minute. All right. Thank you, Your Honor. Thank you, Your Honor. I'm Michael Vanik. I'm an attorney on behalf of the Beverly Hills Health Plan. I don't know how much I can do in a minute, but what I want to do is try to clear up the one question Judge Ezra has asked. And then I'll also try to clear up the issue about the dates on the documents. But real quickly, the question that you asked, which was where it says that there's no non-contract benefit except in the case of emergencies or as otherwise provided in the plan. If you go back, and I'll give you, I don't know that you have the record in front of you, but if you look at the benefit schedule that runs from ER 396 through, say, 400 in this, you'll see that this benefit schedule lays out categories of different kinds of benefits or services that Beverly Hills may have purchased or may not purchase. All right? So the ones that it did, the only one that it did purchase as part of this plan that's non-contracted is the emergency service that everyone's already talked about. So they could have purchased some other services, which would have been the other. Right. And I'll tell you exactly. All right. But you're running out of time, so I wouldn't dwell on this too much. All right. If you look at category Roman numeral 1E, non-contracted provider, subacute care, partial hospitalization, day treatment, not a covered benefit, it says that. Category F, non-contracted provider outpatient service, not a covered benefit. So those are typed in indicating benefit that would have been available, but they opted not to take it. Then when you get into category 3, which is the drug dependency one, you have another repetition of that in paragraph E there that says, non-contracted provider-outpatient service, not a contracted benefit. So what you had was a plan that had to have language that could have covered the situation if they did opt to get that, but they didn't. So it was an emergency or as otherwise provided, and the otherwise provided would have been one of those contracted elements, which was otherwise, which in this case, they did not purchase. Right. Which they specifically opted not to take. And it's clearly set here. But you didn't make it clear what otherwise provided. And that's what it is, because you have to look at the entire agreement and say, okay, what are the things that were otherwise provided. Right. Right. And here you have that. You don't have that. Now, what about these different coverage dates? Oh, okay. I can explain that, I think, in a way that hopefully is the clearest. The first group that you looked at, when you're looking at that, you were looking at the benefit schedule that starts at ER 396. That's the benefit schedule that's attached to the group contract, which was February 2004, and that's the benefit schedule attached to that, which is February 2004. The next benefit schedule you were referring to, which is the one that's stated 12904, that's the one that's attached to what's called the Beverly Hills Hotel Plan A, Evidence of Coverage and Disclosure. And I think what will make it easiest for you to understand what that is, that's essentially a summary plan description. That's the document that participants get for sure. They may get a copy of the group contract, too, but as a matter of course, they'll always get the summary plan description, which is this Evidence of Disclosure. Basically the plain language version. Yeah, it's the plain language one. And what they do is they attach a benefit schedule to that SPD, too. So if you want to really look, the purely operative one is the one that's in the 421 area number. Now, I'd like to say one other thing, and I only have a minute. I've probably gone over and I apologize.  But there's an implication there. No, there isn't, Your Honor, and I'll tell you why. If you look at back to the plan, it's section 140, where it's describing subacute care facilities, which is what a residential treatment facility is. It says, any community residential treatment facility that has entered into a provider agreement with Holman. So by definition ---- We didn't have one. What's that? We didn't have one. We had two. Yeah, but they couldn't take care of that. They might have been able to. You can't say they couldn't take care of it, Your Honor, because the evidence ---- You had two doctors from UCLA say it had to be in one place. No, they suggested visions. Yeah. They didn't say other facilities wouldn't be accurate. No, no, there was ---- And ---- Didn't they say that it's best treated in one facility? Well, they said it ---- Something like that, yeah. They suggested visions because UCLA and visions are close together, and they know about visions. Yeah. They weren't saying visions is the only place that could treat it. I'll take another look at that. So then you ---- Your Honor, that is a ---- 452, they put in the word contracted. Right. Right. So why'd you do that? I think that's overkill because I think if you look at the document ---- Okay. And you read the whole document, which you have to do, you don't see any non-contracted residential care. Did you contract these? Did I? No. No, Your Honor. No, I represent the hotel, and by the way, we're very proud to have this plan in place because we have over 400 employees who take advantage of this plan. And the reason why we can have this plan in place is because it's a plan we can afford, and it provides significant benefits to a lot of employees of ours. And the reason why it's affordable is because it's basically managed care. Holman controls the quality of the provider and the cost, and because it can do that, it can offer this plan to us at an amount that we can afford to provide the greatest benefits for most of our employees. It will never be perfect. It never is, but we're trying to do the best we can. And we think that we've done that with this plan. Thank you. Thank you. I apologize. This matter will stand submitted. She had to reserve some time. I'm sorry. I did reserve some time, and I know I ran over anyway, but I just have a few minor points. At the record, at 787, is the declaration from Holman that attaches the evidence of coverage and the agreement. And it is true that one of the benefit schedules is attached to one document, and the other one is attached to another document. But it is Holman's position that both apply, even though they're two different benefit schedules. Did I say that too fast? The group contract attaches December 04 benefit schedule. The evidence of coverage attaches the February 04 benefit schedule. And according to the declaration of the Vice President for Holman, both apply. So to the extent there's an ambiguity created, it's by their own declaration at ER 787. Okay. What are those numbers again? The declaration starts at 786, I believe. 786. And what's that? And then it attaches, the attachments go all the way back through, sorry, 787. Why don't you just write them down on a little gum sheet and give it to the clerk? Okay. Okay. Matter submitted. Thank you. And thank you very much. Now we come to Corrales v. Bennett.
judges: Pregerson, Hall, Ezra